## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: PHILIPS RECALLED CPAP, BI-LEVEL PAP, AND MECHANICAL VENTILATOR PRODUCTS LIABILITY LITIGATION** | **Case No. 2:21-mc-01230-JFC MDL No. 3014** |
| **This Document Relates to:** JACK WAYNE HOWARD | 2:22-cv-188 |
| *Plaintiff*, v. | **COMPLAINT AND JURY DEMAND** |
| KONINKLIJKE PHILIPS N.V.; PHILIPS NORTH AMERICA LLC; PHILIPS HOLDING USA, INC.; PHILIPS RS NORTH AMERICA LLC; PHILIPS RS NORTH AMERICA HOLDING CORPORATION; WM. T. BURNETT FOAM LLC; WM.T. BURNETT & CO.; WM. T. BURNETT MANAGEMENT, INC.; WM. T. BURNETT HOLDING LLC; WM. T. BURNETT & CO., INCORPORATED; WM. T. BURNETT FIBER LLC; and WM. T. BURNETT IP LLC, | |
| *Defendants*. | |

## COMPLAINT

Plaintiffs by and through his undersigned counsel, alleges as follows:

## INTRODUCTION

1.    Plaintiff brings this action for injuries suffered as a user of Continuous Positive Airway Pressure (CPAP) and Bi-Level Positive Airway Pressure (Bi-Level PAP) devices  and mechanical ventilators manufactured by Philips, which contain polyester-based polyurethane  sound abatement foam ("PE-PUR Foam").

2.    On April 26, 2021, Philips made a public announcement disclosing it had

determined there were risks that the PE-PUR Foam used in certain CPAP, Bi-Level PAP, and mechanical ventilator devices it manufactured may degrade or off-gas under certain circumstances.

3.    On June 14, 2021, Royal Philips issued a recall in the United States of its CPAP, Bi-Level PAP, and mechanical ventilator devices containing PE-PUR Foam, because Philips had determined that (a) the PE-PUR Foam was at risk for degradation into particles that may enter the devices' pathway and be ingested or inhaled by users, and (b) the PE-PUR Foam may off-gas certain chemicals during operation. Philips further disclosed in its Recall Notice that "these issues can result in serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment."

4.    Philips has disclosed that the absence of visible particles in the devices does not mean that PE-PUR Foam breakdown has not already begun. Philips reported that lab analysis of the degraded foam reveals the presence of harmful chemicals, including: Toluene Diamine ("TDA"), Toluene Diisocyanate ("TDI"), and Diethylene Glycol ("DEG").[1]

5.    Prior to issuing the Recall Notice, Philips received complaints regarding the presence of black debris/particles within the airpath circuit of its devices (extending from the device outlet, humidifier, tubing, and mask). Philips also received reports of headaches, upper airway irritation, cough, chest pressure and sinus infection from users of these devices.

6.    In its Recall Notice, Philips disclosed that the potential risks of particulate exposure to users of these devices include: irritation (skin, eye, and respiratory tract), inflammatory

---

[1] Philips Sleep and Respiratory Care Update; Clinical information for physicians, https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-  information-for-physicians-and-providers.pdf (accessed June 27, 2021).

response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic affects. The potential risks of chemical exposure due to off-gassing of PE-PUR Foam in these devices include: headache/dizziness, irritation (of the eyes, nose, respiratory tract and/or skin),  hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

7.      Philips recommended that patients using the recalled CPAP and Bi-Level PAP devices immediately discontinue use of their devices and that patients using the recalled ventilators for life-sustaining therapy consult with their physicians regarding alternative ventilator options.

8.      In or around 2014, Plaintiff purchased a DreamStation device.

9.      In or around February 2020, Plaintiff was diagnosed with chronic kidney disease.

10.      Plaintiff has now incurred substantial expenses for her medical  care and to replace the devices. Since being notified of the  recall, Plaintiff has experienced anxiety concerning the serious  health  risks  he  is  facing  from  possible  exposure  to  off-gassed  or  degraded  PE-PUR Foam  in  the  recalled  machines,  including  the  Philips  DreamStation  device  machine  used  by Plaintiff.

11.      Plaintiff seeks to recover damages based on, *inter alia*, Philips' breach of express warranty, breach of implied warranties, misrepresentations, omissions, and breaches of  state consumer  protection  laws  in  connection  with  its  manufacture,  marketing  and  sales  of  devices containing PE-PUR Foam.

**PARTIES**

12.      Plaintiff is a citizen of the State of Alabama

13.      Defendant Koninklijke Philips N.V. ("Royal Philips") is a public limited liability company established under the laws of The Netherlands, having its principal executive offices at Philips Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands. Royal Philips is the parent

company of Philips North America LLC, Philips Holding USA, Inc., Philips RS North America, and Philips RS North America Holding Corporation.   Royal Philips can be served with process via the *Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters* ("Hague Service Convention").  Defendant Royal Phillips is subject to the jurisdiction and venue of this Court.

14.     Defendant Philips North America LLC ("Philips NA") is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips RS North America LLC is wholly owned by a single member, Philips RS North America Holding Corporation. Philips NA is a wholly-owned subsidiary of Royal Philips.  Upon information and belief, Philips NA manages the operation of Royal Philips' various lines of business, including Philips RS, in North America.  The sole member of Philips NA is PHUSA, which is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141.  Philips NA may be served through its registered agent at, Corporation Service Company, at 1201 Hays Street, Tallahassee FL 32301-2525.

15.     Defendant Philips Holding USA, Inc. ("PHUSA") is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141.  PHUSA is a holding company that is the sole member of Defendant Philips NA.  PHUSA may be served through its registered agent, Corporation Service Company, at 1201 Hays Street, Tallahassee FL 32301-2525.

16.     Defendant Philips RS North America LLC ("Philips RS") is a Delaware corporation with its principal place of business located at 6501 Living Place, Pittsburgh, Pennsylvania 15206.  Philips RS may be served through its registered agent, Corporation Service Company, at 1201 Hays Street, Tallahassee FL 32301-2525.

17.    Defendant Philips RS North America Holding Corporation ("RS Holding") is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Cambridge, Massachusetts 02141, and is wholly owned by PHUSA. Accordingly, Philips RS North America Holding Corporation is a citizen of Massachusetts and Delaware. RS Holding may be served through its registered agent, Corporation Service Company, at 1201 Hays Street, Tallahassee FL 32301-2525.

18.    Defendant Wm. T. Burnett Foam LLC ("Burnett Foam") is a limited liability company organized and existing under the laws of the State of Maryland, has a principal place of business at 1500 Bush Street, Baltimore, Maryland, 21230. Burnett may be served through its registered agent at WM. T. Burnett Management, Inc., 1500 Bush Street, Baltimore, MD 21230.

19.    Defendant Wm. T. Burnett Management, Inc. ("Burnett Management) is a corporation organized and existing under the laws of the State of Maryland, has a principal place of business at 1500 Bush Street, Baltimore, Maryland, 21230. Burnett & Co, Inc. may be served through its registered agent at Richard B. C. Tucker, Jr., 1500 Bush Street, Baltimore, MD 21230.

20.    Defendants Wm. T. Burnett & Co. ("Burnett & Co.") is a corporation owned and operated by Burnett Management and is organized and existing under the laws of the State of Maryland, has a principal place of business at 1500 Bush Street, Baltimore, Maryland, 21230.

21.    Defendants Wm. T. Burnett & Co., Incorporated ("Burnett & Co, Inc") is a textiles corporation organized and existing under the laws of the State of Maryland, has a principal place of business at 1500 Bush Street, Baltimore, Maryland, 21230. Burnett & Co, Inc. may be served through its registered agent at Richard B. C. Tucker, Jr., Inc., 1500 Bush Street, Baltimore, MD 21230.

22.     Defendants Wm. T. Burnett Holding LLC ("Burnett Holding") is a limited liability company organized and existing under the laws of the State of Maryland, has a principal place of business at 1500 Bush Street, Baltimore, Maryland, 21230. The Burnett Holding corporate family is comprised of six companies. Burnett Holding may be served through its registered agent at WM. T. Burnett Management, Inc., 1500 Bush Street, Baltimore, MD 21230.

23.     Defendants Wm. T. Burnett Fiber LLC ("Burnett Fiber") is a limited liability company organized and existing under the laws of the State of Maryland, has a principal place of business at 1500 Bush Street, Baltimore, Maryland, 21230. Burnett may be served through its registered agent at WM. T. Burnett Management, Inc., 1500 Bush Street, Baltimore, MD 21230.

24.     Defendants Wm. T. Burnett IP LLC ("Burnett IP") is a limited liability company organized and existing under the laws of the State of Maryland, has a principal place of business at 1500 Bush Street, Baltimore, Maryland, 21230. Burnett may be served through its registered agent at WM. T. Burnett Management, Inc., 1500 Bush Street, Baltimore, MD 21230.

25.     Royal Philips, Philips NA, PHUSA, Philips RS, and RS Holding are hereinafter collectively referred to as "Philips." Burnett Foam, Burnett Management, Burnett & Co., Burnett Holding, Burnett & Co, Inc., Burnett Fiber, and Burnett IP are hereinafter collectively referred to as "Burnett." Both Philips and Burnett are referred to as "Defendants."

## JURISDICTION AND VENUE

26.     Jurisdiction of this Court is based on diversity of citizenship and the amount in controversy is well in excess of the jurisdictional limit of $75,000.00. 28 U.S.C. Section 1332(a)(1).

27.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b) and (c).

28.     This Court has personal jurisdiction over the Defendants because Defendants

conduct substantial business in this District, and the events giving rise to Plaintiff's claims arise

out of and relate to Defendants' contacts with this District. Defendants Philips RS and Philips NA

are controlled by their parent Royal Philips, and Defendant Philips RS has its principal place of

business in the forum State. Defendants' affiliations with this District are so continuous and

systematic as to render them essentially at home in the forum State. Further, Defendants have

transacted business, maintained substantial contacts, purposefully targeted consumers and

medical professionals for sales of its devices and/or committed overt acts in furtherance of

the unlawful acts alleged in this Complaint in this District, as well as throughout the United

States. The unlawful acts of Defendants have been directed at, targeted, and have had the effect

of causing injury to persons residing in, located in, or doing business in this District, as well as

throughout the United States.

## <u>NATURE OF THE ACTION AND INTRODUCTION</u>

29.     This is a lawsuit seeking judgment against Defendants Koninklijke Phillips N.V.,

Philips North America LLC, and Philips RS North America LLC (collectively "Phillips" or

"Defendants") and Burnett Foam, Burnett Management, Burnett & Co., Burnett Holding, Burnett

& Co, Inc., Burnett Fiber, and Burnett IP (collectively "Burnett" or "Defendants") for personal

injuries and sequelae thereto sustained from Defendants' unreasonable dangerous product, the

DreamStation device manufactured and sold by Defendants.

30.     At all times relevant hereto, Defendants created, designed, assembled,

manufactured, constructed, produced, tested, packaged, labeled, marketed, advertised, promoted,

made, distributed, supplied, and/or sold the DreamStation device.

31.     Philips manufactures and sells medical equipment products. These products include

Continuous Positive Airway Pressure ("CPAP") and Bi-level Positive Airway Pressure ("BiPAP")

machines, which are used in the treatment of sleep apnea, and ventilators, which treat respiratory failure.

32.    On June 14, 2021, Phillips announced a recall of many of its CPAP/BiPAP machines and its ventilators because they suffer from a defect which could result in serious injury, permanent impairment, and may even be life-threatening.

33.    Upon information and belief, Burnett manufactured the polyester-based polyurethane ("PE-PUR") foam, which is used to minimize the sound produced by the devices, during the time period that Philips marketed and sold the subject devices.[2]

34.    According to Philips, this PE-PUR foam can deteriorate over time, causing it to break down.  When the foam breaks down, small foam particles and gases can be inhaled or ingested through the use of the devices which assist patients with respiration.  The foam may emit volatile organic compounds, which when inhaled, can result in serious adverse health effects, including cancer.

35.    Since 2009, Philips has incorporated PE-PUR foam in its PAP devices and ventilators, including the subject devices, for sound abatement purposes.

36.    The basic technology used in PAP devices today was originally developed in 1980 by an Australian pulmonologist, Dr. Colin Sullivan, who first used it to treat dogs with respiratory problems before the technology was adapted to humans.

37.    Respironics commercialized this technology and sold the first publicly available CPAP device in 1985. ResMed, an industry competitor, followed with the release of its own CPAP device in 1989.

---

[2] William T Burnett. (n.d.). Retrieved December 14, 2021, from https://www.williamtburnett.com/

38.     These first-generation PAP devices created a new and commercially viable field of respiratory therapy. However, the devices themselves were large and noisy, resulting in an "arms-race" between competing manufacturers to develop devices that were smaller, more responsive to patient breathing patterns, and, most importantly, quieter.

39.     The noise level of PAP devices became a driver of adult consumer preference, because loud devices interrupt the peaceful sleep of both the patient and their partner, making it less likely the patient will regularly use the device.

40.     Determined to develop the quietest devices on the market with the lowest possible decibel rating, device manufacturers, such as Philips, with the help pf manufacturing companies like Burnett filled PAP and ventilator devices with sound abating foam to reduce the noise emitted from the motor and airflow.

41.     The design of Philips's PAP devices and ventilators, including the subject devices, forced air passes through potentially degraded PE-PUR foam before it is pumped into the patient's airway, thus exposing users to these toxins.

## GENERAL FACTS AND ALLEGATIONS

42.     CPAP and BiPAP machines and ventilators are all used to treat respiratory conditions that help assist the user in respiration.

43.     Sleep apnea (including obstructive sleep apnea) is a common diagnosis that is treated by the use of CPAP and BiPAP machines.

44.     Obstructive sleep apnea is a disorder that occurs when the muscles in the back of your throat relax to the point that they disrupt normal breathing.  When the muscles relax, the airway is hindered, blocking it.  This is a form of apnea, and these occurrences are called "apneas." Symptoms can include excessive daytime sleepiness, observed episodes of stopped breathing

during sleep, abrupt awakenings accompanied by gasping or choking, high blood pressure, and mood changes such as depression or irritability.  Serious cases can lead to hypertension, heart attack or stroke.  Obstructive sleep apnea affects between two (2) and nine (9) percent[3] of adults in the United States; however, many cases are said to go undiagnosed.

45.    A common and widely used nonsurgical treatment for obstructive sleep apnea is CPAP therapy.  CPAP therapy consists of the use a CPAP device, also known as continuous positive airway pressure device.  The device delivers a constant flow of air through a mask that is placed over the nose and mouth, which assists in maintaining steady breathing while sleeping.

46.    BiPAP machines are a similar sub-class of machines that treat sleep apnea.  Unlike CPAP machines, BiPAP machines use two different pressures to mimic inhaling and exhaling rather than the single continuous level of pressurized air delivered by a CPAP device.

47.    CPAP and BiPAP machines both consist of a main unit which connects to a facemask via an air hose.  They are expected to be used every night in order to properly treat the symptoms associated with sleep apnea.

48.    At all times relevant hereto, Defendants manufactured, marketed, sold, and distributed a lineup of CPAP and BiPAP devices as well as ventilator devices under its "Sleep & Respiratory Care" portfolio.  These devices are designed to assist individuals with a number of sleep, breathing, and other respiratory conditions, including sleep apnea.

49.    Defendants sought and obtained Food and Drug Administration ("FDA") approval to market the Recalled Devices, including the subject device used by Plaintiff, under Section 510(k) of the Medical Device Amendment to the Food, Drug and Cosmetics Act.  Section 510(k)

---

[3] Strohl, Kingman P, et al. "Obstructive Sleep Apnea - Pulmonary Disorders." MSD Manual Professional Edition, MSD Manuals, Sept. 2020, www.msdmanuals.com/professional/pulmonary-disorders/sleep-apnea/obstructive-sleep-apnea (last visited July 21, 2021).

allows marketing of medical devices *if* the device is deemed substantially equivalent to other legally marketed predicate devices marketed prior to May 28, 1976. No formal review for safety or efficacy is required.

50.     Under this process, device manufacturers are only required to notify FDA at least ninety (90) days before marketing a device claimed to be "substantially equivalent" to a device FDA approved for sale prior to 1976, when the MDA was enacted.

51.      Under Section 510(k) of the Federal Food, Drug and Cosmetic Act, a medical device does not have to go through the rigors of a clinical study to gain approval by FDA.

52.     Subsequent amendments to the MDA allowed for 510(k) clearance of products deemed "substantially equivalent" to post-MDA 510(k) cleared devices.

53.     Through this domino effect, medical devices deemed "substantially equivalent" to devices previously deemed "substantially equivalent" to devices approved for sale by FDA prior to 1976 could be sold to patients in a matter of ninety (90) days without any clinical testing demonstrating the device's efficacy or safety.

54.     Clearance for sale under the 510(k) process does not equate to "FDA approval" of the cleared device. In 2012, at the request of FDA, National Institute of Health ("NIH") conducted a thorough review of the 510(k) process, coming to the major conclusion that this process was not intended to ensure the safety of medical devices, stating:

> The 510(k)-clearance process is not intended to evaluate the safety and effectiveness of medical devices with some exceptions. The 510(k) process cannot be transformed into a pre-market evaluation of safety and effectiveness so long as the standard for clearance is substantial equivalence to any previously cleared device.[4]

---

[4] Institute of Medicine (U.S.). Committee on the Public Health Effectiveness of the FDA 510(k) Clearance
Process, Medical Devices and the Public's Health 189 (Institute of Medicine, 2011).

55.     NIH explained, "[t]he assessment of substantial equivalence does not require an independent demonstration that the new device provides a 'reasonable assurance of safety and effectiveness."[5]

56.     Further, the NIH pointed out that the classification of predicate devices approved for sale prior to the 1976 MDA "did not include any evaluation of the safety and effectiveness of individual medical devices … [t]hus, it is common for devices to be cleared through the 510(k) program by being found substantially equivalent to devices that were never individually evaluated for safety and effectiveness, either through the original device classification program or through the 510(k) process.[6]

57.     Philips utilized the 510(k)-clearance process for the recalled devices, including the subject devices.

## PHILIPS RECALL OF SLEEP & RESPIRATORY CARE DEVICES

58.     On April 13, 2021, Philips announced the launch of the DreamStation 2, the latest generation of Philips's flagship BiPAP/CPAP product family known as the"DreamStation."

59.     On April 26, 2021, less than two weeks after it announced the launch of the second generation CPAP device, Philips disclosed in its Quarterly Report for Q1 2021 that device user reports had led to a discovery that the type of PE-PUR "sound abatement" foam Philips used and installed into several CPAP and BiPAP respirators to minimize noise, posed health risks to its users.  Specifically, Philips disclosed that "the [PE-PUR] foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone, and certain environmental conditions involving high humidity and temperature."[7]

---

[5] *Id.* at 3
[6] PHILIPS, ANNUAL REPORT 2020 (2021).
[7]      *First      Quarter      Results*,      PHILIPS      (Apr.      26      2021),

60.     On June 14, 2021, as a result of extensive ongoing review following the announcement on April 26, 2021, Philips issued a recall notification for specific affected devices.[8]

61.     According to Philips, this PE-PUR foam can deteriorate over time, causing it to break down.  When the foam breaks down, small foam particles and gases can be inhaled or ingested through the use of the devices which assist patients with respiration.  The foam may emit volatile organic compounds, which when inhaled, can result in a wide range of potential patient impact, from transient potential injuries, worsened symptoms and/or complications, as serious life-threatening injury.

62.     Philips disclosed in their June 14th recall notice that the PE-PUR foam installed in the recalled devices puts the recalled device users at risk of suffering from the following health harms: "Particulate exposure can cause headache, irritation [skin, eye, and respiratory tract], inflammation, respiratory issues, and possible toxic and carcinogenic effects[;]" whereas the "potential risks of chemical exposure due to off-gassing include headache, irritation, hypersensitivity, nausea/vomiting, and possible toxic and carcinogenic effects."[9]

63.     On June 14, 2021, the same day as the recall notice for the subject device, Philips also issued a brief report titled "Clinical Information for Physicians."   In this report, Philips disclosed that "lab analysis of the degraded foam reveals the presence of potentially harmful

---

https://www.results.philips.com/publications/q121/downloads/pdf/en/philips-first-quarter-results-2021-report.pdf (last accessed July 21,2021)

[8] *Medical Device recall notification (U.S. only) / field safety notice (International Markets)*, PHILIPS        RESPIRONICS        (June        14,        2021), https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#section_2(last accessed July 21, 2021)

[9]   Philips   issues   recall   notification,   PHILIPS   RESPIRONICS   (June   14,   2021), https://www.usa.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html(last accessed July 21,2021).

chemicals including: Toluene Diamine, Toluene Diisocyanate, Diethylene glycol."[10] Additionally, in the same report, Philips also disclosed that through testing performed by and for Philips, the presence Volatile Organic Compounds (VOCs) was confirmed. These compounds may be emitted from the sound abatement foam installed in the affected devices. "VOCs emitted as gases from the foam included in the [affected devices] and may have short- and long-term adverse health effects. Standard testing identified two compounds of concern may be emitted from the foam that are outside of safety thresholds. The compounds identified are the following: Dimethyl Diazine and Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)-."

64.    Defendants disclosed receiving complaints about the recalled devices, "representing 0.03 percent of those sold in 2020."[11]  However, Defendants have not disclosed when they first received reports from users of its Sleep & Respiratory Care devices "regarding the presence of black debris/particles within the air path circuit (extending from the device outlet, humidifier, tubing, and mask)."  However, given how long ago the first of the Recalled Devices came to market, it is unlikely that Defendants only recently learned of these issues.

65.    Philips disclosed that an estimated number of "between 3 million and 4 million" devices are subject to the recall.[12]

---

[10] Sleep and Respiratory Care update, Clinical information for physicians, PHILIPS (June 14, 2021),                    https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf?_ga=2.43039205.1759564883.1625006706212130326.1624473291&_gl=1*2nhu1 w*_ga*MjEyMTMwMzI2LjE2MjQ0NzMyOTE.*_ga_2NMXNNS6LE*MTYyNTE1MTQ3MC 4xNi4xLjE2MjUxNTE1OTUuMTg. (last accessed July 21, 2021).

[11] Associated Press, Philips recalls ventilators, sleep apnea machines due to health risks, NBC NEWS,    https://www.nbcnews.com/business/consumer/philips-recalls-ventilators-sleep-apnea-machines-due-health-risks- n1270725 (last accessed July 21, 2021)

[12] *Id.*

66.    On July 8, 2021, Philips released a global supplemental clinical information document that was based on their own testing of the affected devices, stating that, "According to the analysis performed by Philips, the majority of particulates are of a size (>8 μm)..." "Smaller particulates (,1-3 μm) are capable of diffusing into deep lung tissue and deposit into the alveoli." "During testing performed by an outside laboratory on lab degraded foam. The smallest particulate size identified was 2.69 μm."[13]  The Environmental Protection Agency (EPA) notes that exposure to particles less than 10 micrometers can be linked to a variety of health problems including: aggravated asthma, decreased lung function, increased respiratory symptoms, and cardiac related diseases."[14]

67.    On July 29, 2021, The FDA classified the recall as a Class I recall, the most serious type of recall and stated, "Use of these devices may cause serious injuries or death."[15]

68.    Philips instructed users of the recalled CPAP and BiPAP devices to, "Discontinue use of affected units and consult with physicians to determine the benefits of continuing therapy and potential risks."[16]

69.    Philips instructed users of the recalled ventilator devices to, "NOT discontinue or alter prescribed therapy, without consulting physicians to determine appropriate next steps."[17]

---

[13] Respironics, P. (2021, July 8). *Sleep and Respiratory Care update Clinical information*. Retrieved September 16, 2021.
[14] Environmental Protection Agency. (n.d.). EPA. Retrieved September 16, 2021, from https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm.
[15] Center for Devices and Radiological Health. (n.d.). Philips Respironics RECALLS Certain Ventilators, CPAP, AND BIPAP DEVIC. U.S. Food and Drug Administration. https://www.fda.gov/medical-devices/medical-device-recalls/philips-respironics-recalls-certain-continuous-and-non-continuous-ventilators-including-cpap-and.
[16] Medical Device recall notification (U.S. only) / field safety notice (International Markets), PHILIPS    RESPIRONICS    (June    14,    2021), https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#section_2(last accessed July 21, 2021)
[17] *Id.*

70.     All devices subject to the recall were disclosed as part of the June 14, 2021 recall notification.  The list of affected Philips devices includes 18 CPAP, BiPAP, and Ventilator type devices:[18]  Listed below are the affected devices:

a.     Type:  Continuous Ventilator, Minimum Ventilatory Support, Facility Use

   i.   Model:  E30 (Emergency Use Authorization)

b.     Type:  Continuous Ventilator, Non-life Supporting

   i.     Model:  DreamStation, ASV

   ii.     Model:  DreamStation, ST, AVAPS

   iii.     Model:  SystemOne, ASV4

   iv.     Model:  C Series, ASV, S/T, AVAPS

   v.     Model:  OmniLab Advanced Plus, In-lab Titration Device

c.     Type:  Non-continuous Ventilator

   i.     Model:  SystemOne (Q series)

   ii.     Model:  DreamStation

   iii.     Model:  DreamStation GO

   iv.     Model:  Dorma 400, 500

   v.     Model:  REMStar SE Auto

d.     Type:  Mechanical Ventilators

   i.     Model:  Trilogy 100

   ii.     Model:  Trilogy 200

   iii.     Model:  Garbin Plus, Aeris, LifeVent

e.     Type:  Continuous Ventilator, Minimum Ventilatory Support, Facility Use

---

[18] *Id.*

       i.        Model:  A-Series BiPAP Hybrid A30

       ii.       Model:  A-Series BiPAP V30 Auto

    f.      Type:  Continuous Ventilator, Non-life Supporting

       i.        Model:  A-Series BiPAP A40

       ii.       Model:  A-Series BiPAP A30

71.     Defendants knew about the potential health risks from its PAP devices related to PEPUR foam degradation well before notifying the public on June 14, 2021.[19]

72.     Upon information and belief, Burnett knew about the possibility of PE-PUR foam degradation since it began manufacturing the foam for Philips PAP devices.

73.     Upon information and belief, Burnett continued to manufacture the PE-PUR foam after being notified of the risks of foam degradation.

74.      Upon information and belief, Philips knew about the possibility of PE-PUR foam degradation since it began using this particular foam in its PAP devices.

75.     Upon information and belief, Philips knew about the possibility of PE-PUR foam degradation since or before it began researching or developing the DreamStation device.

76.     Upon information and belief, Philips knew of the risk that degraded PE-PUR foam could produce toxic and carcinogenic particulates and VOC gas emissions.

77.     Upon information and belief, Philips knew of the risk that incorporating PE-PUR foam in the air pathway of the subject device could result in users ingesting or inhaling toxic and carcinogenic particulates and VOC gas emissions.

---

[19] Department of Health and Human Services. (2021, November 9). *Form FDA 483*. Retrieved December 14, 2021, from https://www.fda.gov/media/154099/download

78.    Philips should have known of the risk that degraded PE-PUR foam could produce toxic and carcinogenic particulates and VOC gas emissions, and that incorporating PE-PUR foam in the air pathway of the recalled devices could expose users to the risk of ingesting or inhaling toxic and carcinogenic particulates and VOC gas emissions.

79.    An adverse event report from FDA Manufacturer and User Facility Device Experience ("MAUDE") database shows that, as early as 2011, Respironics learned that a patient reported discovering "black dust" on her nose when she awoke the morning after using a RemStar CPAP device and subsequently underwent treatment for "intoxication" and "chest tightness."

80.    Philips investigated this report, and confirmed the device contained "evidence of an unk[nown] black substance in the air path and on internal components…present throughout both the intake and exhaust portions of the air path…" [20]

81.    Philips, however, denied that the presence of the black substance was due to product defect.[21]

## PLAINTIFF JACK WAYNE HOWARD

82.    Plaintiff is a resident and citizen of Tuscaloosa County, Alabama

83.    Plaintiff purchased a Recalled Device, a DreamStation device, prior to June 14, 2021.

84.    The manuals accompanying Plaintiff's Philips DreamStatiom device did  not contain any language or warnings of health risks associated with use of the device, such as

---

[20]  23 MAUDE Adverse Event Report: RESPIRONICS, INC. REMSTAR PRO INTERNATIONAL, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/detail.cfm?mdrfoiid=2000987&pc=BZD (last visited Sept. 10, 2021)
[21]  *Id.*

irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma,  adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic effects. Had Defendants informed Plaintiff of these risks, he would not have purchased or used the Recalled  Device.

85.    Without knowing of the health risks associated with use of the Recalled Device, Plaintiff used h Recalled Device regularly to treat sleep apnea.

86.    As a result of the health risks associated with continued use of the Philips DreamStation device, Plaintiff was diagnosed chronic kidney disease.

## TOLLING AND ESTOPPEL

### I.    DISCOVERY RULE TOLLING

87.    Plaintiff had no way of knowing about Philips' conduct with respect to the health risks associated with the use of the Recalled Device.

88.    Plaintiff, through the exercise of reasonable care, could not have discovered the conduct by Philips alleged herein. Further, Plaintiff did not discover and did not know of facts that would have caused a reasonable person to suspect that Philips was engaged in the conduct alleged herein.

89.    For these, reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiff.

### II.    FRAUDULENT CONCEALMENT TOLLING

90.    By failing to provide immediate notice of the adverse health effects associated with continued use of the Recalled Device, Philips concealed its conduct and the existence of the claims asserted herein from Plaintiff.

91.    Upon information and belief, Philips intended its acts to conceal the facts and claims from Plaintiff. Plaintiff was unaware of the facts alleged herein without any fault or lack of

19

diligence on her part and could not have reasonably discovered Defendants' conduct. For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiff should be tolled.

<u>**COUNT I**</u>
**Strict Products liability – Design Defect**

92.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

93.     At all times herein mentioned, Defendants were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Recalled Devices, including the subject device, which are defective and unreasonably dangerous.

94.     The subject device is defective in its design or formulation in that it is not reasonably fit, suitable or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design.  The subject device is defective in design because it causes headaches, irritation of the skin, eye, and respiratory tract, inflammation, respiratory issues, asthma, adverse effects to organs (including the kidneys and liver), hypersensitivity, nausea, vomiting, and toxic and carcinogenic effects.  It is more dangerous than other available devices indicated for similar conditions and uses, and the utility of the device does not outweigh its risks.

95.     The defective condition of the subject device rendered it unreasonably dangerous and/or not reasonably safe, and the device was in this defective condition at the time it left the hands of Defendants.  Subject device was expected to and did reach Plaintiff and her physician without substantial change in the condition in which it was designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied, and otherwise released into the stream of commerce.

96.     The subject device was used for its intended purposes by Plaintiff and the subject device was not materially altered or modified prior to its use.

97.    The subject device is defective in design because the PE-PUR foam comprising part of the device is subject to degradation by hydrolysis.  These characteristics cause, among other problems, cancer, kidney injuries and cardiac injuries.

98.    At or before the time the subject device was released on the market and/or sold to Plaintiff, Defendants could have designed the product to make it less prone to causing the above listed health harms, a technically feasible safer alternative design that would have prevented the harm Plaintiff suffered without substantially impairing the function of the device.

99.    Plaintiff was not able to discover, nor could she have discovered through the exercise of reasonable diligence, the defective nature of the subject device.  Further, in no way could Plaintiff have known that Defendants had designed, developed, and manufactured the subject device in a way as to make the risk of harm or injury outweigh any benefits.

100.    Defendants knew or should have known that the Recalled Devices, including the subject device, would be prescribed to patients and that physicians and patients were relying on them to furnish a suitable device.  Further, Defendants knew or should have known that patients for whom the Recalled Devices would be used, such as Plaintiff, could be and would be affected by the defective design and composition of the devices.

101.    Defendants researched, designed, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective device which, when used in its intended or reasonably foreseeable manner, created an unreasonable risk to the health of consumers, such as Plaintiff, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

102.    Plaintiff was proximately harmed by the design defects in the subject device as described above.

WHEREFORE, Plaintiff demands judgment against Defendants, individually, jointly,

vicariously, severally, and/or in the alternative, for such damages as may be permitted pursuant to the laws of the State of Alabama, together with interest thereon, costs of suit and attorneys' fees.

### COUNT II
### Strict Products Liability – Failure to Warn

103.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

104.    At all times herein mentioned, Defendants designed, developed, researched, tested, and knew or should have known about significant carcinogenic risks with subject device.

105.    At all times herein mentioned, Defendants advertised, promoted, marketed, sold, and distributed the subject device that was used by the Plaintiff.

106.    The subject device was expected to and did reach the usual consumers, handlers, and persons coming into contact with said device without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

107.    Defendants each had an independent duty and continuing duty to warn the medical community and Plaintiff's physicians about the significance of the risks of cancer and other health harms with the subject device.

108.    Plaintiff used the subject device in a manner intended and foreseeable by Defendants.

109.    The subject device was defective due to inadequate warnings because Defendants knew or should have known that the product created a significantly increased risk of chronic kidney disease among other health impacts, and failed to warn the medical community and Plaintiff's physician of the nature of such risks.

110.    Defendants omitted and downplayed the significantly increased risks of chronic kidney disease and other health risks with the subject device that Defendants knew or should have known from previous testing and research even prior to subject device's FDA approval.

111.    The subject device's labeling and warnings were defective because they omitted and inadequately warned of the device's risk of cancer and other health issues.

112.    If Defendants would have properly warned about the subject device's cancer risk and/or other health harms, no reasonable physician, including Plaintiff's physician, would have recommended or prescribed the subject device because the potential benefits of non-obstructive sleep are significantly outweighed by the risk of chronic kidney disease.

113.    Had Defendants reasonably provided adequate warnings of chronic kidney disease.

114.    , such warnings would have been heeded and no healthcare professional, including Plaintiff's physician, would have prescribed the subject device and no consumer, including Plaintiff, would have purchased and/or used the subject device.

115.    Plaintiff was proximately harmed by the design defects in the subject device as described above.

WHEREFORE, Plaintiff demands judgment against Defendants, individually, jointly, vicariously, severally, and/or in the alternative, for such damages as may be permitted pursuant to the laws of the State of Alabama, together with interest thereon, costs of suit and attorneys' fees.

<u>**COUNT III**</u>
**Strict Liability – Manufacturing Defect**

116.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

117.    At all times herein mentioned, Defendants were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Recalled Devices, including the subject device, which are defective and unreasonably dangerous.

118.    The subject device was expected to and did reach Plaintiff without a substantial change in its condition.

119.    The finished subject device deviated, in terms of construction and quality, from the specifications or planned output in a manner that made it unreasonably dangerous.

120.    At all times relevant hereto, the Recalled Devices, including the subject device, were defectively and improperly manufactured and designed by Defendants in that Defendants continued to supply consumers with the Recalled Devices despite having full knowledge that the devices posed substantial and avoidable bodily injury, including non-Hodgkin's lymphoma.

121.    The foreseeable risks of the subject device were known and could have been avoided.

122.    At all times relevant hereto, the subject device was defectively manufactured by Defendants in that its design and formulation is more dangerous than what an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

123.    At all times relevant hereto, Defendants actively deceived users that their use of the Recalled Devices posed safety risks that far outweighed any benefits.

124.    Furthermore, the Recalled Devices, including the subject device, were defectively manufactured in that the PE-PUR foam comprising part of the devices can degrade into particles that enter the devices' air pathway and can off-gas certain chemicals.  These characteristics cause, among other problems, non-Hodgkin's lymphoma. Plaintiff and other similarly situated consumers

were unknowingly subjected to receiving different doses of toxins, carcinogens, respiratory irritants and other deleterious components and contaminants when using the Recalled Devices.

125.    Plaintiff was proximately harmed by the design defects in the subject device as described above.

## COUNT IV
### Negligence - Design Defect Plaintiff

126.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

127.    Each of the subject devices was expected to reach, and did reach, users and/or consumers, including without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

128.    Defendants, Philips, owed Plaintiff a duty to exercise reasonable care in designing and testing the subject device.

129.    Defendants, Philips designed the subject device for the purpose of helping treat respiratory disorders through positive airway pressure.

130.    At all times material hereto, the subject devices were used in a manner intended and/or foreseeable to the Defendants.

131.    A patient or consumer using the subject device would reasonably expect the device to be free of significant defects.

132.    The subject device, as designed by the Defendants, releases chemicals and off gases particles, including Toluene Diamine, Toluene Diisocyanate, Diethylene glycol.

133.    The subject device, as designed by the Defendants, directly transmits carcinogenic materials to patients during CPAP and/or BiPAP therapy.

134.    The foreseeable risks of using the subject device, particularly respiratory illnesses up to and including death, significantly outweigh the benefits conferred upon patients using the subject device.

135.    Reasonable alternative designs existed for the subject device which would have eliminated or reduced the risk of inhalation of carcinogenic materials and volatile organic compounds.

136.    Reasonable and feasible alternative designs include, but are not limited to, RESMed, 3B Medical and Apex Medical.

137.    The failure to use feasible, reasonable alternative designs that eliminate the release of chemicals and off gassed particles renders the subject device unreasonably unsafe.

138.    Defendants knew or should have known Philips DreamStation device was likely to release carcinogenic chemicals and volatile organic compounds.

139.    Plaintiff's injuries were caused by Defendants' conduct as follows:

a.   Failing to conduct adequate safety and efficacy testing before placing the subject device into the stream of commerce;

b.   Failing to timely establish procedures for reviewing the design of the subject device after receiving information that patients were developing respiratory illnesses as a result of using the subject device;

c.   Failing to timely establish procedures for validation or, where appropriate, review and approval of design change orders for the subject device before their implementation; and

d.   Failing to design or redesign the subject device to eliminate or mitigate the release of carcinogenic chemicals and/or volatile organic compounds.

140.    Plaintiff was proximately harmed by the design defects in the subject device as described above.

WHEREFORE, Plaintiff demands judgment against Defendants, individually, jointly, vicariously, severally, and/or in the alternative, for such damages as may be permitted pursuant to the laws of the State of Alabama, together with interest thereon, costs of suit and attorneys' fees.

## COUNT V
### Negligence – Manufacturing Defect

141.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

142.    The subject device was expected to reach, and did reach, users and/or consumers, including Plaintiff without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

143.    Defendants manufactured the subject device for the purpose of helping treat respiratory disorders through positive airway pressure.

144.    At all times material hereto, the subject device was used in a manner intended and/or foreseeable to the Defendants.

145.    A reasonable patient or consumer of the subject device would expect that the device be free of significant defects.

146.    The subject device, as manufactured by the Defendants, releases carcinogenic chemicals and/or volatile organic compounds.  The subject device, as manufactured by the Defendants, directly releases carcinogenic chemicals and/or volatile organic compounds.

147.    The foreseeable risks of using the subject device, particularly the risk of respiratory illnesses up to and including death, significantly outweigh the benefits conferred upon patients using the subject device.

148.    Plaintiff's injuries were caused by Defendants' conduct as follows:

a.    Failing to timely establish procedures or practices to prevent the subject device from releasing carcinogenic chemicals and/or volatile organic compounds;

b.    Manufacturing and selling the subject device in a state that would allow for the breakdown and release of carcinogenic chemicals and/or volatile organic compounds; and

c.    Failing to ensure proper workmanship, materials and labeling for the subject device.

149.    Plaintiff was proximately harmed by the manufacturing defects in the subject device as described above.

WHEREFORE, Plaintiff demands judgment against Defendants, individually, jointly, vicariously, severally, and/or in the alternative, for such damages as may be permitted pursuant to the laws of the State of State of Alabama, together with interest thereon, costs of suit and attorneys' fees.

## COUNT VI
## Negligence - Warnings Defects Plaintiff

150.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

151.    The subject device was expected to reach, and did reach, users and/or consumers, including Plaintiff without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

152.    Defendants owed Plaintiff a duty to exercise reasonable care in marketing, advertising, promoting, distributing and/or selling the subject device.

153.    Defendants marketed, advertised and promoted the subject device for the purpose of helping treat respiratory disorders through positive airway pressure.

154.    At all times material hereto, the subject device was used in a manner intended and/or foreseeable to the Defendants.

155.    A reasonable patient or consumer of the subject device would expect that the device be free of significant defects.

156.    The subject device releases carcinogenic chemicals and volatile organic compounds, and directly transmits such chemicals and compounds to patients during airway pressure therapy.

157.    Defendants knew or should have known that carcinogenic chemicals and volatile organic compounds were likely to be released from the subject device and could be spread to patients through the sound abatement foam.

158.    The foreseeable risks of using the subject device, particularly severe respiratory disorders and/or death, significantly outweigh the benefits conferred upon patients using the subject device.

159.    Plaintiff's chronic kidney disease was caused by Defendants' conduct as follows:

a.    Failing to warn patients like Plaintiff and/or purchasers of the subject device that the sound abatement foam broke down and released carcinogenic chemicals and volatile organic compounds and were unnecessarily transmitted into the users of subject device; and

b.    Failing to timely notify known purchasers of the subject device that patients could be exposed to carcinogenic chemicals and volatile organic compounds;

160.    Plaintiff was proximately harmed by the warnings defects in the subject device as described above.

WHEREFORE, Plaintiff demands judgment against Defendants, individually, jointly, vicariously, severally, and/or in the alternative, for such damages as may be permitted pursuant to the laws of the State of Alabama, together with interest thereon, costs of suit and attorneys' fees.

## COUNT VII
### Breach of Implied Warranty of Merchantability

161.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

162.    Defendants marketed, advertised and promoted the subject device for the purpose of helping treat respiratory disorders through positive airway pressure.

163.    The subject device sold by Defendant and used in Plaintiff treatment of obstructive sleep apnea was subject to an implied warranty of merchantability.

164.    Defendants warranted and represented that the subject device was merchantable and fit for the intended uses and that the device was otherwise safe in its design, manufacture, construction and operation for ordinary use.

165.    Defendants breached these implied warranties regarding the subject device, including its component parts, in that the device was not merchantable and fit for the intended uses and were otherwise unsafe in its design, manufacture, construction and operation for ordinary use.

166.    The subject device designed, marked and sold by Defendants was expected to reach, and did reach, users and/or consumers, including Plaintiff, without substantial change in the defective unreasonably dangerous condition in which it was sold or distributed.

167.    The Defendants breached the implied warranty as the subject device was defective at the time of the sale in that it was not fit to treat obstructive sleep apnea without releasing carcinogenic chemicals and/or volatile organic compounds in users using the subject device system.

168.    Defendants' breach of their implied warranties violated numerous statutes.

169.    Plaintiff was proximately harmed by the breach of implied warranty of the Defendants as described above.

WHEREFORE, Plaintiff demands judgment against Defendants, individually, jointly, vicariously, severally, and/or in the alternative, for such damages as may be permitted pursuant to the laws of the State of Alabama, together with interest thereon, costs of suit and attorneys' fees.

## COUNT VIII
### Negligent Misrepresentation

170.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

171.    Defendants designed, manufactured, marketed, advertised, promoted, and sold the subject device which was expected to reach, and did reach, users and/or consumers, including Plaintiff.

172.    Defendants owed Plaintiff and her physicians, and health-care providers a duty to exercise reasonable care in labeling, marketing, advertising, promoting, distributing and/or selling the subject device.

173.    Based upon information and belief, the Defendants supplied information to Plaintiff and health-care providers including, but not limited to, product labeling, and advertising and promotional materials.

174.    The subject device releasing carcinogenic chemicals and/or volatile organic compounds.

175.    Defendants knew or should have known that sound abatement foam could break down and release carcinogenic chemicals and volatile organic compounds into the users of subject device.

176.    The information supplied by the Defendants misrepresented the safety of the subject device.  The Defendants represented that the subject device should be replaced every five years because the air pressure emitted would decrease over time.  The Defendants excluded information regarding release of carcinogenic chemicals and/or volatile organic compounds.

177.    The Defendants intended for Plaintiff's physicians and health-care providers to rely upon these representations in their prescription practices.

178.    Plaintiff's physicians and health-care providers relied upon these representations in deciding to purchase, prescribe and use the subject device.

179.    At all times material, the subject device was used in a manner intended and/or foreseeable to the Defendants.

180.    The Defendants failed to exercise reasonable care or competence in communicating these risks to Plaintiff and/or her health-care providers.

181.    Plaintiff was proximately harmed by the negligent misrepresentations made by the Defendants as described above.

WHEREFORE, Plaintiff demands judgment against Defendants, individually, jointly, vicariously, severally, and/or in the alternative, for such damages as may be permitted pursuant to the laws of the State of Alabama, together with interest thereon, costs of suit and attorneys' fees.

## PUNITIVE DAMAGES

182.    Plaintiff adopts and incorporates by reference all of the foregoing language of this Complaint as if fully set forth herein and further states as follows.

183.    Defendants' conduct described herein consisted of oppression, fraud, and/or malice, and was done with advance knowledge, conscious disregard of the safety of others, and/or

ratification by Defendants' officers, directors, and/or managing agents.

184.    Despite their knowledge of the Recalled Devices' propensity to cause an inflammatory respiratory response, adverse effects of organs and/ or cancer and other serious injuries, Defendants chose profits over the safety of American citizens suffering with sleep apnea when they sought to create and market a device posing significant health risks. Despite having substantial information about the Recalled Devices' serious and unreasonable side effects, Defendants intentionally and recklessly failed to adequately warn the public, physicians, and the medical community.

185.    Further, despite having substantial information about the Recalled Devices' serious and unreasonable side effects, Defendants failed to make the decision to pull the devices from the market after receiving indications and after receiving reports from consumers who were experiencing serious injuries associated with the use of the devices.

186.    Defendants downplayed and recklessly disregarded their knowledge of the defective nature of the Recalled Devices' potential for causing serious injuries.

187.    Defendants chose to do nothing to warn the public about serious and undisclosed side effects with the Recalled Devices.

188.    Defendants recklessly failed to warn and adequately instruct physicians, including Plaintiff's physician, regarding the increase in reports from consumers who were experiencing serious injuries associated with the use of the Recalled Devices.  Consequently, Defendants are liable for punitive damages in an amount to be determined by the jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against the Defendants, and each of them, as  follows. For past and future general damages on each cause of action, according to proof;

1.    For past and future pain and suffering, according to proof;

2.    For past and future hospital, medical, nursing care, treatment and incidental expenses, according to proof;

3.    For past and future loss of earnings and earning power, according to proof;

4.    For past and future mental and emotional distress, according to proof;

5.    For restitution, according to proof;

6.    For punitive damages in an amount appropriate to punish and/or set an example of Defendants, or is in any other way appropriate.

7.    For past and future costs of suit incurred herein, and attorney's fees as may be allowed by law; and

For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

DATED: February 1, 2022                    Respectfully submitted,

*/s/ Christopher A. Seeger*
Christopher A. Seeger [CS4880 (D.N.J.)]
David R. Buchanan
Jeffrey S. Grand
Caleb Seeley
Humaira S. Safdar
SEEGER WEISS LLP
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Tel: 973-639-9100
Fax: 973-679-8656
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
jgrand@seegerweiss.com
cseeley@seegerweiss.com
hsafdar@seegerweiss.com

*Attorneys for Plaintiff*